## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEROY PLATER, JR.<br>37590 Terry Swann Lane<br>Mechanicsville, MD 20659<br>(301) 884-2792<br><br>and<br><br>MARK MCCOY<br>9284 Adelphi Road<br>Hyattsville, MD 20783<br>(240) 432-5133<br><br>               Plaintiffs,<br><br>   v.<br><br>W.A. CHESTER, L.L.C.<br>4390 Parliament Place<br>Suite Q<br>Lanham, MD 20706<br><br>C/O Corporation Service Company<br>as Registered Agent<br>1090 Vermont Avenue, N.W.<br>Washington, DC  20005<br><br>         Defendant. | Case No. 1:06-cv-01219 (PLF)<br><br>(Employment Discrimination and Retaliation)<br><br><br>**Jury Trial Demanded** |

## AMENDED COMPLAINT

## INTRODUCTION

1.   Plaintiffs LEROY PLATER, JR. ("Plater") and MARK MCCOY ("McCoy")

(collectively, "Plaintiffs"), through undersigned counsel, hereby file this amended complaint

1203358.12

against Defendant, W.A. CHESTER, L.L.C. ("Chester" or "Defendant"), pursuant to the Civil Rights Act of 1866 (42 U.S.C. § 1981), as amended ("Section 1981"), Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e) et seq.), as amended ("Title VII") and the District of Columbia Human Rights Act (D.C. Code Ann. § 2-1401, et seq.) ("DCHRA").

2.    This case is about unabashed and pervasive race discrimination. Defendant maintains a workplace in which the racial climate smacks more of the dawn of the 20th Century than the 21st. It is a place where supervisors freely use the word "nigger" to refer to African-American employees. It is a place where white foremen feel comfortable telling their managers that they do not want any black employees on their crew, and where their requests are honored. It is a place with no African-American foremen, supervisors or managers, and where African-American employees are all but totally excluded from the highest paying non-management work position (Cable Splicer). It is a place where African-Americans are denied training opportunities offered to less experienced whites, are subjected to excessive scrutiny, are punished more severely for minor infractions than their white counterparts and are generally treated as second-class citizens.

3.    Amid this racially hostile environment, Plater and McCoy, two of Defendant's tiny handful of skilled African-American employees, struggled in vain to be treated with some semblance of equality with their white co-workers. Plater, a Journeyman Lineman for six years, has been trying, with little success, to get the necessary training to advance into the more skilled and more highly respected and paid position of Cable Splicer. When he complained about the discriminatory treatment he was receiving, Plater was admonished by management, shunned, isolated, and restricted for several months from any splicing opportunities.

1203358.12

4.    McCoy was hired by Chester nine months ago as a Cable Splicer, after having worked in that field for Consolidated Edison ("Con Edison") in New York City for the previous fifteen years.  Despite his many years of experience, McCoy was treated like a novice, was harassed by constant nit-picking, was for the most part denied the chance to work at cable splicing, was not paid as a Cable Splicer, and was finally terminated without cause in May 2006. With the termination of McCoy, Chester once again has no certified African-American Cable Splicers.

5.    Plater and McCoy shared several of the same supervisors and they both experienced the same pattern and practice of race discrimination that pervades the Chester workplace.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

7.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a)(4), because this action seeks damages and equitable relief under an act of Congress providing for the protection of civil rights.

8.    This Court has supplemental jurisdiction over the DCHRA claims in this action pursuant to 28 U.S.C. § 1367(a), because this action is a civil action of which the district court has original jurisdiction and the DCHRA claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

1203358.12

9.    Venue is also proper in this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), because a substantial part of the events and omissions giving rise to the claims occurred in the District of Columbia.

10.    On May 19, 2005, Plater filed a timely charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"), complaining of the unlawful acts described herein.  The EEOC issued to Plater a Notice of the Right to Sue for the charge on June 15, 2006.  This action is, therefore, timely filed, and Plater has met all administrative prerequisites to bringing this lawsuit under Title VII.

## PARTIES

11.    Plater is a 45-year-old African-American male.  He is a United States citizen and a resident of the state of Maryland.  Plater has been employed by Defendant since 1999.

12.    McCoy is a 35-year-old African-American male.  He is a United States citizen and a resident of the state of Maryland.  McCoy worked at Chester from September 2005 until May 2006.

13.    On information and belief, Chester is incorporated in Delaware, with its principal place of business in the District of Columbia.  At all relevant times, Chester conducted, and continues to conduct, business in the District of Columbia, Maryland and Virginia.  Chester is a member of the Pepco family of companies, and is a wholly-owned subsidiary of Pepco Energy Resources, Inc., which in turn is a wholly-owned subsidiary of Pepco Holdings, Inc.

14.    Defendant is an employer within the meaning of Title VII (42 U.S.C. § 2000e (a) and (b) and the DCHRA (D.C. Code Ann. § 2-1401.02(10)).

1203358.12

## COMMON FACTS

**Structure of Defendant's Organization**

15.    Defendant is a company specializing in the installation of underground high voltage cable transmission and distribution systems.

16.    Defendant's field supervisors, some key personnel and specialized equipment and vehicles are based at Defendant's field office and yard in the District of Columbia (the "Benning Road Yard"). The Defendant dispatches personnel, equipment and vehicles to projects across the region and the country from the Benning Road Yard. Defendant also has smaller yards in Springfield, Virginia (the "Springfield Yard") and Rockville, Maryland (the "Rockville Yard").

17.    On information and belief, during the time period covered by this Complaint, Eddie Orange ("Orange"), who is white, was, successively, General Foreman of the Springfield Yard, Superintendent of the Benning Road Yard, General Superintendent of all Chester operations at the three local yards (Benning Road, Springfield and Rockville), and, most recently, Vice President for Human Resources.

18.    Defendant's employees are assigned to one of the three yards. A General Foreman oversees the operation of each yard.

19.    Chester's employees typically work in crews. A crew may consist of seven or eight people, and may include some or all of the following crew members: a) Foreman, b) Sub-foreman c) Cable Splicer, c) Journeyman Lineman, d) Operator, and e) Apprentice.

      a.    Foremen oversee and supervise the general operations of the crew and distribute assignments.

1203358.12

b.  Sub-Foremen assist the Foremen in overseeing the crew. Crews normally do not have a Sub-Foreman unless there are more than eight crew members.

c.  Cable Splicers install, repair, maintain and splice underground wires and cables. They are paid more per hour than Journeyman Lineman. In addition, on information and belief, Cable Splicers are guaranteed eight hours of work per day, even if inclement weather prevents crews from working on a given day. (This benefit is known at Chester as "guaranteed eight" or "guaranteed forty," the latter signifying the hours guaranteed per work week.) Other job classifications at Chester are not "guaranteed forty," but are only guaranteed two hours of pay on a day when the weather prevents crew members from working. Also on information and belief, Cable Splicers have more opportunities to work overtime than Journeyman Lineman and other employee classes, because there are relatively few Cable Splicers and because splicing jobs often take more than eight hours to complete.

d.  Journeyman Lineman install, repair, and maintain wires and cables, as well as assist Cable Splicers. They are paid less per hour than Cable Splicers and are not "guaranteed forty."

e.  Operators perform various tasks, including the operation of transportation vehicles.

1203358.12

f.    Apprentices are hired as trainees with the expectation that they will advance to higher positions.  Their pay depends upon experience and tasks performed.

20.   Manhole Inspectors inspect manholes and other areas containing cable transmission and distribution systems.  Manhole Inspectors are traditionally grouped together with other Manhole Inspectors; they are not grouped with other crew members.  Manhole Inspectors are less skilled and are paid less per hour than either Journeyman Lineman or Cable Splicers.

21.   Cable splicing involves the installation, removal and maintenance of underground cables.  There are three general categories of splices: rubber, trifurcating, and lead.  Rubber splicing requires the use of rubber to connect two separate cables.  Trifurcating splicing requires the use of both rubber and lead to connect two separate cables.  Lead splicing requires the use of lead to connect two separate cables.  A branch splice is a more complex type of lead splice connecting one cable to two separate cables.  A double branch splice is the most complex type of lead splice connecting two cables to two separate cables.  While all three splicing categories vary in difficulty depending on the job, lead splicing is generally the most complicated and dangerous.

**Chester's Lack of Effective Anti-discrimination Policies and Procedures**

22.   Defendant lacks effective policies and procedures for claims of discrimination. Defendant does not readily make available to its employees its anti-discrimination policies and procedures, nor does it provide its employees or supervisors adequate training on its anti-discrimination policies and procedures.  In addition, sensitive matters concerning racial discrimination are not kept confidential and employees reporting complaints are not protected from retaliation.

1203358.12

23.    Other African-American employees, in addition to Plaintiffs, have in the past complained about Defendant's racially discriminatory working conditions.  On information and belief, Defendant has rarely disciplined any white managers, supervisors or employees for discriminatory behavior.

        a.    From approximately 2002 through 2003 while at the Benning Road Yard, at least one of Defendant's supervisors told an African-American employee that he would be given the opportunity to rotate jobs with other white Apprentices.  Despite this promise, however, this African-American employee was kept doing unskilled work on a pole setting crew for two years, while white Apprentices with less seniority and experience were allowed to perform different higher-skilled jobs and advance within the company.  This African-American employee complained to his supervisor to no avail.

        b.    In or around March 2004, Thomas Morsell, an African-American employee, filed a formal complaint alleging race discrimination against Orange, then Defendant's General Superintendent, with the International Brotherhood of Electrical Workers, Local 70 Union (the "Union").

        c.    In or around December 2004, Roland Carter, an African-American Journeyman Lineman, had not yet gotten the raise to which he was entitled after being promoted to the Journeyman Lineman category, and raised the issue with Orange.  On information and belief,

- 8 -

1203358.12

Orange not only denied Carter's request, but gave directions for him to be reassigned, saying "Send that nigger over there to Jeff's crew." Carter was subsequently reassigned to the crew of Foreman Jeff Grimsley (white).

d.  Eric Harwood, one of the few African-American Cable Splicers ever employed at Chester, filed a race discrimination charge against Chester with the EEOC, which he subsequently settled.

e.  In or around March 2006, an African-American journeyman lineman with over 20 years experience applied for an open foreman position. Orange told him that "I know that you're qualified. You are over qualified, but this job is not for you." Defendant instead promoted a less qualified white employee with approximately five years of experience.

f.  An African-American employee reported to management that a white crew member called him "nigger" several times. Upon information and belief, no disciplinary action has been taken by Chester against the perpetrator with regard to this complaint.

g.  On information and belief, the most lucrative aspect of working for Chester is the opportunity to go on assignments outside the metropolitan Washington area, or to work on long-term, fixed-price contracts here or elsewhere. These jobs afford extensive overtime, so that it is possible to earn a year's salary in six months. Chester's management regularly provides these opportunities to

1203358.12

white employees, but rarely, if ever, offers them to African-American employees.

24.  Defendant has at all relevant times known or should have known about the racial discrimination against African-American employees occurring in its business, and nevertheless allows it to continue.

## PLATER FACTS

### Discrimination at the Benning Road Yard - Overhead Work

25.  From 1999 to the present, Plater has been employed by Chester as a Journeyman Lineman at the Benning Road Yard, except for a seven-month period starting in mid-2003, when he was assigned to the Springfield Yard.

26.  From approximately 1999 to 2003, Plater worked at the Benning Road Yard as a Journeyman Lineman. During most of this period, Plater performed "overhead" work, which involves the maintenance, installation and removal of cables running along utility poles.

27.  Depending on the placement of the pole, overhead work can be accomplished in several different ways. One method is the use of a large bucket on a mechanized crane that carries a crew member to the top of the pole. A second method requires a crew member to climb to the top of the utility pole carrying his own equipment. This method is more arduous and dangerous than using buckets. A third method requires a crew member to climb to the top of a pole and then stand on a board that is attached to the pole. This method is the most arduous and dangerous.

28.  While conducting overhead work at the Benning Road Yard, Bobby McGregor (white) and Danny Holloway (white) were Plater's Foreman and Sub-Foreman, respectively. McGregor and Holloway disproportionately assigned jobs requiring climbing and the use of

1203358.12

boards to Plater and other African-American crew members, while at the same time they assigned white crew members to the less dangerous jobs permitting the use of buckets.

**Discrimination at the Benning Road Yard - Underground Work**

29.  In or around 2002, Plater began performing "underground" work, which involves the maintenance, installation and removal of cables running underground.

30.  Plater consistently expressed to numerous supervisors and members of Chester management his desire to obtain the experience and training necessary for promotion from Journeyman Lineman to Cable Splicer.

31.  Defendant has continually denied Plater the opportunity to become a Cable Splicer and to receive a Cable Splicer's wage, "guaranteed forty" and other attendant benefits and prestige.  During this time Defendant has provided other white employees with less experience than Plater, opportunities to obtain the on-the-job training necessary for promotion to Cable Splicer and has promoted such employees to that position.

32.  Shortly before filing this Complaint, Plater was belatedly told that henceforth he would be paid at Cable Splicer rates, but only for the time he actually spends splicing.  He has yet to receive the full-time job classification of Cable Splicer.

33.  In or around early 2003, Defendant entered into a contract with Virginia Power Company.  As part of the contract, Defendant was awarded a substantial amount of cable splicing for crews at the Springfield Yard.  Consequently, Defendant decided to transfer a number of employees from the Benning Road Yard to the Springfield Yard.

34.  Other than a volunteer list, there was no formal selection process to determine whom to transfer.  Orange, then General Foreman of the Springfield Yard, was responsible for choosing who would be transferred.

1203358.12

35.   In order to obtain the cable splicing work potentially offered by the transfer to the Springfield Yard, Plater placed his name on the volunteer list from which transferees were initially selected. Plater was the only African-American on the list.

36.   In anticipation of the transfer to the Springfield Yard, Plater and other crew members attended a mandatory three-day splicing training class at the Benning Road Yard. On the final day of the training class, Jeff Hess, a white Journeyman Lineman and an employee of Defendant, joined the class.

37.   Upon completion of the class, Defendant told Plater that they would not transfer him to the Springfield Yard. Instead, Chester transferred Hess, even though he had less splicing training and was less qualified than Plater. With the addition of Hess, all employees initially transferred were white.

**Discrimination at the Springfield Yard**

38.   Some time later, when the volume of work at the Springfield Yard increased beyond the capacity of the then-current crews, Chester transferred Plater to the Springfield Yard. Plater was assigned to Foreman Dwayne Taylor's (white) crew, and was the first African-American to be assigned to that crew. Jim Taylor (white), Dwayne Taylor's father, was the General Foreman of the Springfield Yard at the time. There were no African-American Cable Splicers at the Springfield Yard.

39.   It soon became apparent to Plater that other crew members at the Springfield Yard, including Foreman Dwayne Taylor, regarded him as unwelcome and that he was being treated differently from the white crew members. For instance, he was not invited to attend, or even told about, daily work planning meetings run by Dwayne Taylor. During these meetings, all white

1203358.12

crew members received their daily work assignments. Plater, by contrast, was forced to call Dwayne Taylor daily for his assignments.

40. While at the Springfield Yard, Dwayne Taylor rarely allowed Plater to splice cable, even though Plater expressed an interest in splicing, was capable of splicing, and was part of a crew that received splicing work. In fact, more often than not, Dwayne Taylor assigned Plater to above-ground tasks, which did not permit him to assist or even observe the Cable Splicer.

41. On those occasions when Plater was assigned to work underground, Plater typically was not allowed to splice, unless there was no trained white crew member available to do the job. In this way, Defendant prevented Plater from gaining the training and experience he desired and needed to become a Cable Splicer.

42. Some months after Plater's transfer to the Springfield Yard, Plater was given a small number of rubber splicing jobs. For this work, Plater was paid only a Journeyman Lineman's wage even though he was entitled to a Cable Splicer's wage. On information and belief, a white journeyman lineman known as "Red Eye" received a Cable Splicer's wage for splicing rubber cable and Chester paid Cable Splicer wages to other white Journeymen Linemen for time spent splicing cable.

43. On information and belief, Defendant has represented to Virginia Power, its customer, that all Journeyman Linemen are certified Cable Splicers.

44. On information and belief, Defendant financially benefited from holding out Plater as a certified Cable Splicer while paying him only a Journeyman Lineman's wage.

45. In 2003, Plater approached officials of the Union regarding the discriminatory and unfair treatment he experienced at the Springfield Yard. Plater discussed the matter with Wes Spruill (white), Business Manager for the Union, and Bob Smith (white), leader of the Union.

- 13 -

Plater offered to submit a written complaint to the Union. Smith told Plater that he did not have to do so because Plater was Recording Secretary for the Union. Smith said that he would "take care" of the matter.

46.   On information and belief, Smith contacted Orange regarding Plater's complaint about the discriminatory and unfair treatment he experienced at the Springfield Yard. On information and belief, Orange then contacted General Foreman of the Springfield Yard, Jim Taylor, to inform Taylor of the matter.

47.   Shortly after Plater registered his complaint with the Union, General Foreman Jim Taylor convened a meeting with his son, Foreman Dwayne "Wilson" Taylor, and Plater. The General Foreman angrily chastised Plater for taking his discrimination complaint to the Union, saying "What happens in my yard, stays in my yard." Also during that meeting, Foreman Dwayne Taylor attempted to excuse his own behavior, saying: "I don't hate blacks. I just don't like Mexicans."

48.   On information and belief, Jim Taylor and Dwayne Taylor informed other employees at the Springfield Yard that Plater had made a claim of race discrimination. Following Plater's conversation with Jim and Dwayne Taylor, white crew members intimidated, taunted and teased Plater regarding Plater's complaint to the Union. One white crew member called Plater a "cry baby" and said that he did not want to work with Plater. Another white crew member told Plater to "find another place to work" and that "the [Union] hall is that way."

49.   Because of the discriminatory and unfair treatment Plater experienced at the Springfield Yard, and in order to gain more experience in lead splicing, Plater several times requested a transfer from the Springfield Yard back to the Benning Road Yard. Plater made this

1203358.12

request on several different occasions to Orange, Jim Taylor and Dwayne Taylor. Each time he was denied.

## More Discrimination at the Benning Road Yard

50. In early 2004, Defendant finally transferred Plater back to the Benning Road Yard.

51. Prior to the transfer, Orange assured Plater that he would receive cable splicing training at the Benning Road Yard; however, Orange assigned Plater to Foreman Bob Terry's (white) crew, which received very few cable splicing jobs compared to other crews at the Benning Road Yard.

52. At the time of Plater's transfer, the crews of Foremen Phil Forester (white), Jeff Grimsley (white) and Emory Kelly (white) received most of the cable splicing jobs. Consequently, Plater approached each of these foremen about becoming a member of their crew. These efforts were in vain.

53. Shortly after Plater's transfer, Plater overheard a conversation between Foremen Forester and Orange, in which Forester said that he did not want any blacks on his crew and Orange agreed.

54. Not surprisingly, Forester did not provide Plater with the splicing experience he requested. On information and belief, to date, there have been no African-Americans on Forester's crew.

55. Plaintiff soon learned that Foreman Kelley shared a similar point of view. During a conversation in the presence of one or more Chester employees, Kelley said, "If I had my choice, there would be no niggers working for me." This statement was reported to Plater shortly after it was made by a white crew member who was present when Kelley made the statement. On

information and belief, during Kelley's tenure as Foreman, there have been no African-Americans on his crew.

56.   Similarly, a white Cable Splicer at the Benning Road Yard who often worked with Plater recommended to Kelley that he allow Plater to splice cable.  Kelley's response was:  "No, that won't happen as long as I'm Foreman."

57.   While Plater was struggling to get cable splicing experience, Chester provided that experience freely to white employees.  For example, Plater and Luke Holmes, a white Apprentice Journeyman Lineman, arrived at the Benning Road Yard at approximately the same time.  While Chester regularly assigned Holmes to work with cable and provided on-the-job lead splicing training, even though he was only an apprentice, such opportunities were regularly denied to Plater.

58.   In or around 2004, after several of Plater's white crew members approached management and expressed their opinion that Plater was qualified to do some of the more complicated splices, Plater was finally permitted to do these jobs.  Since that time, Plater has done approximately 50 such splicing jobs, but until shortly before this complaint was filed, he did not receive splicing pay for those jobs.

59.   On several occasions, Plater asked Orange and Kelley why he did not receive a Cable Splicer's wage while doing trifurcating splicing jobs.  Orange and Kelley replied that lead splicing experience was a prerequisite to receiving a Cable Splicer's wage.  When Plater then asked why "Red Eye" received a Cable Splicer's wage even though he did not have experience splicing lead, Kelley replied that "Red Eye" was "grandfathered," meaning that he was exempt from the so-called requirement that purportedly prevented Plater from being paid at a Cable Splicer's rate.

1203358.12

60.   In or around 2004, in response to Plater's request to receive on-the-job lead cable splicing training, Kelley told Plater to practice lead cable splicing by himself on rainy days. Plater did so, and practiced lead cable splicing in the rain on at least ten different days without compensation.  In contrast, white Apprentices such as Holmes and Jacob Roll often received on-the-job lead cable splicing training as part of their normal work day and, on information and belief, received a Cable Splicer's wage for that work.

61.   On one occasion, while performing a trifurcating splice, Plater informed Foreman Terry that he had no silicon grease in his kit.  A kit is supposed to provide all the necessary tools and equipment for a particular job.  Terry replied that Plater did not need the grease and should proceed without it.  Without the grease, however, Plater had a much more difficult time completing that job.  Terry then reported to Orange that Plater did not perform the job adequately.

62.   On another occasion, Terry yelled at Plater for allegedly working too slowly even though another crew member was responsible for the delay.  Terry then told other crew members that Plaintiff was incompetent as a Cable Splicer.

63.   On yet another occasion, Terry tampered with Plater's phasing job after completion. (Phasing involves the identification of wires from one end of a cable to another and involves the coordination of crew members on both ends of the cable.)  Terry then reported to Orange that Plater did the job incorrectly.  Terry's continuing acts of sabotage of Plater's work product and reputation harmed Plater's reputation, and as a result, he received fewer opportunities to splice.

64.   On several occasions, a white crew member at the Benning Road Yard greeted Plater on the job by stating, "How's my little brown buddy?"

65.   Because of the hostile work environment created by Foreman Terry, Plater asked Orange for a transfer to another crew in the Benning Road Yard.  Orange denied Plater's request

- 17 -

1203358.12

but offered to assign Plater to the Rockville Yard. Plater declined the offer since the Rockville

Yard offered relatively little opportunity for splicing.

66.    In approximately February 2005, Harwood, fed up with the discriminatory treatment

he was receiving, resigned from Chester. On Harwood's last day, Orange accused Harwood of

stealing equipment and called him a "nigger" and "black motherfucker" in the presence of two

police officers. This incident was reported to Plater.

67.    In 2005, Plater retained legal counsel. Plater's counsel sent a letter, dated March 18,

2005, to Defendant regarding the discrimination committed by Defendant and its employees

against Plater and African-American employees generally.

68.    From approximately March through June 2005, Plater was not given any splicing

jobs. During this three month period, Plater asked Foreman Grimsley about splicing training and

opportunities. Grimsley at first replied, "No problem," and indicated that he would talk to

Orange about the issue. It is unclear whether Grimsley discussed the matter with Orange, and he

never responded to Plater's request.

69.    In or around May 2005, upon information and belief, Foreman Grimsley stated that

"No niggers will splice cable on my crew." When this statement was reported to Plater by a

crew member who heard it, Plater became sick to his stomach.

70.    Plater has endured enormous mental, physical and emotional strain as a result of the

discrimination he has experienced while working for Defendant, which continues to the present

time. The steady diet of disparate treatment, harassment, rejection and racial hatred which he

encountered day after day has left him feeling depressed, embarrassed, shamed, disgusted and

betrayed. As a result of this strain, Plater's doctor increased the strength of his blood pressure

medicine. In addition, Plater experienced trouble sleeping, as well as relationship problems with

1203358.12

his wife and children.  Plater has sought professional help to deal with the emotional impact of these conditions.

71.  On May 19, 2005, Plater and Harwood filed complaints with the EEOC.  The complaints alleged Defendant and its employees discriminated against Plater and Harwood based on their race.

72.  In retaliation for his formal and informal complaints of discrimination, Chester (a) denied Plater splicing training opportunities, (b) raised the requirements that Plater would have to meet for qualification as a Cable Splicer, (c) exposed him to extreme danger by sending him underground to splice lead cable without adequate resources and assistance, (d) denied him the opportunity to satisfy the purported heightened qualification requirements which would have entitled Plater to a higher pay scale, and (e) harassed Plater and generally made it difficult and painful for Plater to work at Chester.

73.  Shortly after Plater and Harwood filed complaints with the EEOC, in a presumed effort to boost the number of African-American employees in anticipation of legal action, Defendant hired approximately eight African-American employees as Manhole Inspectors, as well as an African-American Cable Splicer, plaintiff Mark McCoy.

74.  In the summer of 2005, Foreman Terry openly admitted to having lied to Orange about Plater's allegedly poor work performance.  Terry made this admission in the presence of several other crew members.  Plater informed Kelley, who by that time had been promoted to General Foreman, and Jay Miranda (white), the Safety Coordinator at the Benning Road Yard, who recently was given the responsibility to handle discrimination complaints, of Terry's admission of lying.  On information and belief, Chester investigated and confirmed the truth of

1203358.12

Plater's accusations, but has taken no action against Terry for his discriminatory treatment of Plater.

75.   In or around November 2005, Defendant issued an intra-company memorandum listing the qualifications to become a Cable Splicer and thus receive a Cable Splicer's wage. The memorandum listed "branch" splicing as a new prerequisite. Prior to this time, Orange and Kelley told Plater that he would become a Cable Splicer and be paid a Cable Splicer's wage once he gained some experience in lead splicing. Neither Foremen had ever told Plater about a branch splicing requirement.

76.   In or around January 2006, General Foreman Kelley sent Plater underground alone to splice lead for the first time, even though Plater had no formal training. Because lead splicing is extremely dangerous, industry practice requires an experienced lead Cable Splicer to assist anyone splicing lead for the first time. Plater was not given such assistance but nevertheless successfully completed this job. Plater did not receive a Cable Splicer's wage for this job. On information and belief, Kelley and other employees of Defendant did not expect Plater to successfully complete this job alone and with virtually no training.

77.   Since January 2006, Plater has successfully completed more than eight lead splicing jobs, but until shortly before filing this complaint he was not paid a Cable Splicer's wage.

78.   George Warrington (white), Plater's current Foreman, ridiculed Plater by stating, in reference to Plater's complaints, "Good thing I ain't black, otherwise I would be rich."

79.   On April 27, 2006, Plater's crew was scheduled to perform a branch splice, which could have given Plater the chance to be certified under the new, higher requirement to be paid as a Cable Splicer. Several hours before the job, however, Foreman Warrington told Plater not

- 20 -

1203358.12

to report to work. A white Apprentice Journeyman Lineman replaced Plater on the splicing assignment.

80.   Since the time Plater started working for Defendant, several white crew members have been promoted to the position of Cable Splicer. Some of the white crew members even began working for Defendant *after* Plater did and held lower-paying positions than Plater.

81.   Plater continues to suffer significant emotional distress from the discriminatory environment in which he must work. The stress caused by this hostile work environment has adversely affected both his professional and personal life.

## MCCOY FACTS

82.   Prior to being hired at Chester, Mark McCoy had nearly fifteen years of underground experience, which included lead splicing experience at Con Edison. McCoy had undergone extensive training consisting of coursework, written and practical exams and hands-on apprentice training. After being certified as a Cable Splicer, McCoy spliced cable on a regular basis. McCoy's credentials and experience were at least on par with that of any Cable Splicers at Chester.

83.   In September 2005, approximately four months after Plater had filed an EEOC charge of race discrimination against Chester, and a few months after Harwood, Chester's only African-American Cable Splicer, resigned, McCoy accompanied an acquaintance to the building that also houses Chester's corporate headquarters for an unrelated purpose. While there, McCoy began speaking with Chester's receptionist, who apparently told others at Chester that McCoy had cable splicing experience. Upon learning of McCoy's background, Bob Thompson (white), Chester's President, Don Cherba (white), Chester's Project Manager and one other high level

1203358.12

manager located at Defendant's corporate headquarters invited McCoy to apply for a position with Chester.

84.  Shortly thereafter, McCoy met with Orange, who required McCoy to undergo a splicing skills test.  McCoy successfully passed the test.

85.  On information and belief, Chester's officers decided to ask McCoy to apply for a job, and Chester hired McCoy, to try to strengthen the company's defenses to the pending EEOC claim of Plater.

86.  When McCoy was hired, the Union classified McCoy as an "Intermediary Splicer" for the first thirty days of employment.  After this thirty-day probationary period, McCoy was classified as a "Cable Splicer."

87.  When McCoy was hired, he became the only African-American classified as a Cable Splicer at Chester.

88.  Orange discussed the terms and conditions of employment with McCoy when he extended him an offer of employment.  Orange informed McCoy that McCoy was being hired as a Cable Splicer.

89.  Despite this representation by Orange, McCoy was given very few splicing opportunities in the eight months he was employed at Chester.

90.  Orange also told McCoy that McCoy would receive Journeyman pay, which McCoy understood to mean Cable Splicer pay, and that McCoy would get "guaranteed forty" hours of work per week.

91.  On information and belief, Chester pays white Cable Splicers at the rate of a Cable Splicer at all times they are on duty, regardless of the tasks they are performing.  The only

1203358.12

exception to this is in situations where for some reason they are receiving a higher rate of pay for temporarily taking on a different assignment.

92. On information and belief, white Cable Splicers at Chester receive "guaranteed forty" hours of work per week.

93. On information and belief, Chester also pays Cable Splicer wages to white employees who are not classified as Cable Splicers, for time spent actually splicing cable.

94. Although he was classified as a Cable Splicer, Chester did not pay McCoy Cable Splicer's wages, except in connection with one cable splicing job, and he did not receive "guaranteed forty."

**Discrimination at the Benning Road Yard**

95. For the first two months of his employment, McCoy worked at the Benning Road Yard. McCoy was assigned to the crew of Foreman Terry, a crew which still received very few splicing jobs compared to other crews.

96. It became immediately clear to McCoy that he was unwelcome and that he was being treated differently than his white co-workers. Foreman Terry would ignore McCoy or address him in a demeaning or condescending manner. On the limited occasions when Terry would engage in conversation with McCoy, he would treat McCoy as an idiot and explain really rudimentary things to him like "this is called tape."

97. During these first two months, McCoy was given only two or three splices to perform, and was mainly relegated to the unskilled tasks of lifting and pulling cable. McCoy was not paid a Cable Splicer's wage for the splices he performed.

98. After these splicing jobs, McCoy repeatedly inquired with his supervisor and management about why he did not receive a Cable Splicer's wage.

1203358.12

99. McCoy spoke with Orange about his rate of pay. In contrast to his earlier statements, Orange told McCoy that he was not being paid as a Cable Splicer because "there are a lot of people ahead of you." When McCoy tried to get Orange to clarify how the position of others could be relevant to McCoy's pay rate, he never got a satisfactory answer from Orange.

100. McCoy also spoke with a white Union official, about the disparity in his pay rate. The Union official responded that Chester had to "wait and see how [he] worked out," that Chester was doing him "a favor" by paying him Journeyman Lineman's wage, and that it "takes some time" to make Cable Splicer's pay.

**Discrimination at the Rockville Yard**

101. In late 2005, McCoy was transferred to the Rockville Yard. Kelley informed McCoy that he was being transferred because the Rockville Yard needed a Cable Splicer and that there were many splicing opportunities there.

102. Upon arriving at the Rockville Yard, Robert Ezell (white), General Foreman of the Rockville Yard, informed McCoy that he would be performing primarily non-splicing "grunt" work. For the next month, McCoy did no splicing, but instead carried tools and ladders, sent down tubes, pulled up tubes, pulled up garbage, and pulled cable in and out of manholes.

103. While at the Rockville Yard, McCoy was paid at the rate of a Journeyman Lineman, not a Cable Splicer. He also did not receive a "guaranteed forty" hours of work per week.

104. In or around early January 2006, while still working at the Rockville Yard, McCoy performed approximately eight splicing jobs -- four branch splices and four trifurcating splices. McCoy was not paid at the rate of a Cable Splicer for any of this work.

105. While at the Rockville Yard, Defendant assigned McCoy to several complex lead splicing jobs without a "print." A print is a diagram containing essential specifications and exact

1203358.12

dimensions used to assist Cable Splicers in performing splicing jobs. In the normal custom of the trade, a print is provided in each splicing kit and is relied upon by the Cable Splicer in doing the particular job.

106. When McCoy looked through the kit on his first branch splice assignment and found no print, he asked his Foreman Chris Brown (white) where the print was. Brown responded in a taunting voice, asking "Oh, you're looking for instructions? You don't know how to do the job?" Fortuitously, while working on a prior job, McCoy had found and saved some print sheets that had been used and then discarded by another Cable Splicer, and was able to use one of those prints to complete the splice to which he was assigned. Without these saved prints, McCoy would have been unable to perform the four branch splices to which he was initially assigned. Only *after* he had performed these four difficult splices without having been given any prints, was McCoy finally given a splicing print "book," which provides standard prints for various types of splices. On information and belief, Chester's white Cable Splicers had already been provided with this "book." McCoy soon concluded that he was being set up to fail, and that Defendant was attempting to compile a paper record that would justify terminating him.

107. At a meeting with Orange, Cherba, and Miranda in January 2006, McCoy complained about the fact that he had been transferred to Rockville where the amount of cable splicing work was negligible, while almost all of the splicing work was centered at the Benning Road Yard, from which he had been transferred. Orange acknowledged the truth of McCoy's assertion and sought to justify it by saying that there were other, less experienced people at the Benning Road Yard whom Chester was "trying to bring up." On information and belief, the less experienced employees to whom Orange was referring were all white. McCoy responded that he thought it was unfair that he was sent to a yard where there was little splicing to be done, where

1203358.12

he was not earning Cable Splicer's pay, and where his splicing skills were getting rusty so that others who were less skilled could be trained and advanced ahead of him.

**More Discrimination at the Benning Road Yard**

108. In February 2006, Defendant transferred McCoy back to the Benning Road Yard where he had started. At around the time of this reassignment, McCoy received a call from a co-worker at Chester, who warned McCoy to be careful, and said "they are going to railroad you" at the Benning Road Yard. Unlike most of the other Cable Splicers, McCoy was given no regular assignment to any particular crew and would not know until he came in each morning where and with which crew he would be working that day. On many occasions, McCoy would have to stand in the yard and ask around or call Kelley to find out what his work would be for that day. White Cable Splicers are not treated in that manner, but either have a regular crew assignment or are given assignments in advance.

109. Because McCoy was not assigned to a particular crew, on several occasions he was left standing in the Benning Road Yard asking crew members and calling supervisors about what his assignment was for the day. On one occasion, while McCoy was standing at the Benning Road Yard waiting for his assignment, Foreman Terry intentionally ignored him, even though he clearly noticed McCoy and McCoy was assigned to work on his crew that day. After McCoy learned from Kelley that he was assigned to Terry's crew, Kelley had to drive him to Terry's job site, because Terry had left without him. McCoy continued to feel as though he was being set up to fail.

110. Throughout the spring of 2006, McCoy's work was subjected to extreme scrutiny not given to any of the white Cable Splicers. Minor, inconsequential discrepancies, such as momentarily letting some dirt from his glove get onto the cable, or not being quick enough to

1203358.12

remove the black carbon paper from the cable, were suddenly escalated into major violations. Unlike his white counterparts, his work was closely scrutinized for flaws and critiqued by various supervisors. McCoy found himself being called to task with increasing frequency for "violations" of proper splicing procedure that were either non-existent or inconsequential.

111. McCoy was paid at the Cable Splicer rate of pay for only one job. On information and belief, during the time McCoy was working at Chester, white Cable Splicers received a Cable Splicer's wage even when they were not performing splicing jobs.

112. In March of 2006, McCoy was called into the office for the first of what would prove to be a series of three meetings with four members of senior management (Orange, Cherba, Kelley and Miranda) which were part of an effort by Defendant to create a paper trail that would justify terminating McCoy. At the first of these meetings, Orange told McCoy that he had gotten reports from a source which he refused to identify that McCoy was not working hard enough, and was not a "team player." This was the first time McCoy heard these allegations. He expressed surprise at these allegations, and asked for an opportunity to confront his accusers in order to resolve the situation, but was denied any such opportunity.

113. Approximately one week later, McCoy was again summoned to the office for a second meeting with the same high management officials. This time, the pretextual reason for the meeting was that a few days earlier, while pulling cable in a manhole, McCoy did not realize quickly enough that the cable reel behind him was getting low and needed to be replaced. Again, no one addressed their concern about the matter with him at the time it happened. Orange accused McCoy, based upon this incident, of not paying attention while working, and threatened to transfer him to the Springfield Yard where there were not as many splicing opportunities.

1203358.12

114. Shortly after this meeting, McCoy was assigned to the Manhole Inspection crew for one day. On information and belief, no white Cable Splicers had ever previously been assigned to the Manhole Inspection crew. Chester took this action to demean McCoy in the eyes of his co-workers.

115. On or around May 3, 2006, a team of supervisors was dispatched to Rockville to inspect each of the four lead branch splices which McCoy had performed while working in the Rockville Yard to look for any leaks or flaws. None were found.

116. On May 4, 2006, after the team of supervisors had searched in vain for any sign of defect or leakage in the Rockville splices, McCoy was nonetheless discriminatorily terminated. McCoy was summoned into the office for the third time before the same four senior managers. This time, Orange said, "Based on information being fed to us, it is not working out, so we are letting you go. Thanks for trying us." Orange declined to say what information he had received, or from whom. And so ended McCoy's eight month period of employment. Once again, Defendant has no certified African-American Cable Splicers.

117. Several days after his termination, McCoy received a copy of a document that had been provided by Chester to the Union, stating that McCoy was terminated on May 3, 2006, because he was "not qualified and will not accept training or direction from others" and "[d]oes not work well with others." This statement was false in all respects. McCoy was well qualified, never refused to accept training or direction from others, and never had any problems in working with other employees.

118. All actions and failures to act by Chester and its agents, servants and employees described in the preceding paragraphs were willful, wanton and malicious, and were undertaken in reckless disregard of Plaintiffs' federal and District of Columbia statutory rights.

- 28 -

1203358.12

## COUNT ONE

### (Section 1981 -- Hostile Work Environment -- Plater)

119.    Plater incorporates allegations 1 through 118 above as though fully set forth herein.

120.    Plater is African-American and a member of a protected class.

121.    Defendant violated Plater's civil rights under Section 1981 by creating, encouraging, condoning and/or tolerating a racially hostile work environment, which Plater has experienced from the beginning of his employment up to the present time.  The discriminatory practices described above, including but not limited to the use of racial epithets and other racially offensive and demeaning remarks directed at Plater and other minorities; ignoring Plater and excluding him from meetings; excluding Plater from splicer training opportunities given to whites; requiring Plater to perform more dangerous tasks more frequently than his white counterparts, thereby increasing the risk that he would be seriously injured on the job; depriving Plater of Cable Splicer's pay to which he was entitled; and forcing Plater to perform inappropriately lower-level tasks, thereby degrading and stigmatizing him in the eyes of his peers; all combined to create a racially hostile environment.

122.    Defendant knew or should have known that its employees were engaging in discriminatory practices directed at Plater and other minorities and subjecting Plater to unwelcome racial slurs and other racially offensive and demeaning remarks while working within the scope and in furtherance of their employment.  Indeed, current Vice-President of Human Resources Orange was a lead perpetrator in the creation of the racially hostile environment at Chester and supervisory foremen both perpetrated and condoned much of the hostile conduct.

- 29 -

1203358.12

123.    The discriminatory conduct and racial hostility toward Plater and other African-Americans was sufficiently severe and pervasive to alter the terms and conditions of Plater's employment. Defendant was aware that Plater did not find the hostile conduct welcome.

124.    Defendant's discrimination against Plater was intentional and based on race. Defendant acted with malice or with reckless indifference to Plater's rights.

125.    Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

126.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions, including severe emotional pain and distress, mental anguish, humiliation and embarrassment.

127.    Plater has no plain, adequate, or complete remedy at law. He has suffered, and is continuing to suffer, irreparable injury because of Defendant's racially discriminatory policies and practices.

## COUNT TWO

### (Title VII -- Hostile Work Environment -- Plater)

128.    Plater incorporates allegations 1 through 127 above as though fully set forth herein.

129.    Plater is African-American and a member of a protected class.

130.    Defendant violated Plater's civil rights under Title VII by creating, encouraging, condoning and/or tolerating a racially hostile work environment, which Plater has experienced from the beginning of his employment up to the present time. The discriminatory practices described above, including but not limited to the use of racial epithets and other racially

1203358.12

offensive and demeaning remarks directed at Plater and other minorities; ignoring Plater and excluding him from meetings; excluding Plater from splicer training opportunities given to whites; requiring Plater to perform more dangerous tasks more frequently than his white counterparts, thereby increasing the risk that he would be seriously injured on the job; depriving Plater of Cable Splicer's pay to which he was entitled; and forcing Plater to perform inappropriately lower-level tasks, thereby degrading and stigmatizing him in the eyes of his peers; all combined to create a racially hostile environment.

131.    Defendant knew or should have known that its employees were engaging in discriminatory practices directed at Plater and other minorities and subjecting Plater to unwelcome racial slurs and other racially offensive and demeaning remarks while working within the scope and in furtherance of their employment.  Indeed, current Vice-President of Human Resources Orange was a lead perpetrator in the creation of the racially hostile environment at Chester and supervisory foremen both perpetrated and condoned much of the hostile conduct.

132.    The discriminatory conduct and racial hostility toward Plater and other African-Americans was sufficiently severe and pervasive to alter the terms and conditions of Plater's employment.  Defendant was aware that Plater did not find the hostile conduct welcome.

133.    Defendant's discrimination against Plater was intentional and based on race. Defendant acted with malice or with reckless indifference to Plater's rights.

134.    Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

1203358.12

135.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions, including severe emotional pain and distress, mental anguish, humiliation and embarrassment.

136.    Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's racially discriminatory policies and practices.

## COUNT THREE

### (DCHRA -- Hostile Work Environment -- Plater)

137.    Plater incorporates allegations 1 through 136 above as though fully set forth herein.

138.    Plater is African-American and a member of a protected class.

139.    Defendant violated Plater's civil rights under the DCHRA by creating, encouraging, condoning and/or tolerating a racially hostile work environment, which Plater has experienced from the beginning of his employment up to the present time.  The discriminatory practices described above, including but not limited to the use of racial epithets and other racially offensive and demeaning remarks directed at Plater and other minorities; ignoring Plater and excluding him from meetings; excluding Plater from splicer training opportunities given to whites; requiring Plater to perform more dangerous tasks more frequently than his white counterparts, thereby increasing the risk that he would be seriously injured on the job; depriving Plater of Cable Splicer's pay to which he was entitled; and forcing Plater to perform inappropriately lower-level tasks, thereby degrading and stigmatizing him in the eyes of his peers; all combined to create a racially hostile environment.

1203358.12

140.     Defendant knew or should have known that its employees were engaging in discriminatory practices directed at Plater and other minorities and subjecting Plater to unwelcome racial slurs and other racially offensive and demeaning remarks while working within the scope and in furtherance of their employment.  Indeed, current Vice-President of Human Resources Orange was a lead perpetrator in the creation of the racially hostile environment at Chester and supervisory foremen both perpetrated and condoned much of the hostile conduct.

141.     The discriminatory conduct and racial hostility toward Plater and other African-Americans was sufficiently severe and pervasive to alter the terms and conditions of Plater's employment.  Defendant was aware that Plater did not find the hostile conduct welcome.

142.     Defendant's discrimination against Plater was intentional and based on race.  Defendant acted with malice or with reckless indifference to Plater's rights.

143.     Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

144.     Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions, including severe emotional pain and distress, mental anguish, humiliation and embarrassment.

145.     Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's racially discriminatory policies and practices.

## COUNT FOUR

### (Section 1981 -- Denial of Training and Advancement -- Plater)

- 33 -

1203358.12

146.    Plater incorporates allegations 1 through 145 above as though fully set forth herein.

147.    Plater is African-American and a member of a protected class.

148.    Plater applied for and was qualified to receive training as a Cable Splicer and to advance into that position.

149.    Defendant denied Plater training in splicing and opportunities for advancement as a Cable Splicer, but provided such opportunities to white employees who had less experience, less seniority and were less qualified.

150.    Defendant's actions in denying Plater training and advancement were intentional and based on his race.  Defendant acted with malice or with reckless indifference to Plater's rights.

151.    Defendant's actions have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant, in violation of Section 1981.

152.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

153.    Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from the discriminatory job treatment.

154.    Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

155.    Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

1203358.12

## COUNT FIVE

### (Title VII -- Denial of Training and Advancement -- Plater)

156.   Plater incorporates allegations 1 through 155 above as though fully set forth herein.

157.   Plater is African-American and a member of a protected class.

158.   Plater applied for and was qualified to receive training as a Cable Splicer and to advance into that position.

159.   Defendant denied Plater training in splicing and opportunities for advancement as a Cable Splicer, but provided such opportunities to white employees who had less experience, less seniority and were less qualified.

160.   Defendant's actions in denying Plater training and advancement were intentional and based on his race.  Defendant acted with malice or with reckless indifference to Plater's rights.

161.   Defendant's actions have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant in violation of Title VII.

162.   Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

163.   Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from the discriminatory job treatment.

164.   Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

1203358.12

165.  Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT SIX

### (DCHRA -- Denial of Training and Advancement -- Plater)

166.  Plater incorporates allegations 1 through 165 above as though fully set forth herein.

167.  Plater is African-American and a member of a protected class.

168.  Plater applied for and was qualified to receive training as a Cable Splicer and to advance into that position.

169.  Defendant denied Plater training in splicing and opportunities for advancement as a Cable Splicer, but provided such opportunities to white employees who had less experience, less seniority and were less qualified.

170.  Defendant's actions in denying Plater training and advancement were intentional and based on his race.  Defendant acted with malice or with reckless indifference to Plater's rights.

171.  Defendant's actions have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant in violation of the DCHRA.

172.  Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

173.  Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from the discriminatory job treatment.

1203358.12

174.   Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

175.   Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT SEVEN

### (Section 1981 -- Retaliation -- Plater)

176.   Plater incorporates allegations 1 through 175 above as though fully set forth herein.

177.   Plater is African-American and a member of a protected class.

178.   Plater first filed a charge of discrimination based on race with the Union in 2003.

179.   After being notified that Plater filed a discrimination charge with the Union, Defendant engaged in threatening, harassing and punitive behavior, including shunning and isolating Plater from his co-workers, denying his request to transfer away from an increasingly hostile environment, and depriving him of training and splicing opportunities.  Defendant's conduct constitutes retaliation in violation of Section 1981.

180.   In or about March 2005, Plater's counsel sent a letter, dated March 18, 2005, to Defendant regarding Defendant's discriminatory treatment towards Plater and Harwood.

181.   On May 19, 2005, Plater filed a formal charge of discrimination based on race with the EEOC.

182.   On July 6, 2006, Plater filed a civil complaint alleging employment discrimination and retaliation in the United States District Court for the District of Columbia.

1203358.12

183.   After receiving correspondence from Plater's counsel, learning that Plater had filed a discrimination charge with the EEOC, and learning that Plater had filed a civil complaint in the United States District Court for the District of Columbia, Defendant has subjected Plater to continuing retaliatory treatment, including harassment, hostile work environment, deprivation of splicer training, deprivation of splicing opportunities, exposure to danger in connection with Plater's first lead cable splice, denial of Cable Splicer pay, and denial of opportunities to fulfill the qualifications for Cable Splicer certification.  Defendant's conduct constitutes retaliation in violation of Section 1981.

184.   Defendant's retaliatory actions were intentional and based on race.  Defendant acted with malice or reckless indifference to Plater's rights.

185.   Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's retaliatory actions.

186.   Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from Defendant's retaliatory job treatment.

187.   Plater has suffered lost wages and benefits resulting from the retaliatory job treatment.

188.   Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's retaliatory policies and practices.

## COUNT EIGHT

### (Title VII -- Retaliation -- Plater)

189.   Plater incorporates allegations 1 through 187 above as though fully set forth herein.

190.   Plater is African-American and a member of a protected class.

- 38 -

1203358.12

191.   Plater first filed a charge of discrimination based on race with the Union in 2003.

192.   After being notified that Plater filed a discrimination charge with the Union, Defendant engaged in threatening, harassing and punitive behavior, including shunning and isolating Plater from his co-workers, denying his request to transfer away from an increasingly hostile environment, and depriving him of training and splicing opportunities.  Defendant's conduct constitutes retaliation in violation of Title VII.

193.   In or about March 2005, Plater's counsel sent a letter, dated March 18, 2005, to Defendant regarding Defendant's discriminatory treatment towards Plater and Harwood.

194.   On May 19, 2005, Plater filed a formal charge of discrimination based on race with the EEOC.

195.   On July 6, 2006, Plater filed a civil complaint alleging employment discrimination and retaliation in the United States District Court for the District of Columbia.

196.   After receiving correspondence from Plater's attorney, learning that Plater had filed a discrimination charge with the EEOC, and learning that Plater had filed a civil complaint in the United States District Court for the District of Columbia, Defendant has subjected Plater to continuing retaliatory treatment, including harassment, hostile work environment, deprivation of splicer training, deprivation of splicing opportunities, exposure to danger in connection with Plater's first lead cable splice, denial of Cable Splicer pay, and denial of opportunities to fulfill the qualifications for Cable Splicer certification.  Defendant's conduct constitutes retaliation in violation of Title VII.

197.   Defendant's retaliatory actions were intentional and based on race.  Defendant acted with malice or with reckless indifference to Plater's rights.

1203358.12

198.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's retaliatory actions.

199.    Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from Defendant's retaliatory job treatment.

200.    Plater has suffered lost wages and benefits resulting from the retaliatory job treatment.

201.    Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's retaliatory policies and practices.

## COUNT NINE

### (DCHRA -- Retaliation -- Plater)

202.    Plater incorporates allegations 1 through 199 above as though fully set forth herein.

203.    Plater is African-American and a member of a protected class.

204.    Plater first filed a charge of discrimination based on race with the Union in 2003.

205.    After being notified that Plater filed a discrimination charge with the Union, Defendant engaged in threatening, harassing and punitive behavior, including shunning and isolating Plater from his co-workers, denying Plater's request to transfer away from an increasingly hostile environment, and depriving him of training and splicing opportunities. Defendant's conduct constitutes retaliation in violation of DCHRA.

206.    In or about March 2005, Plater's counsel sent a letter, dated March 18, 2005, to Defendant regarding Defendant's discriminatory treatment towards Plater and Harwood.

207.    On May 19, 2005, Plater filed a formal charge of discrimination based on race with the EEOC.

1203358.12

208.    On July 6, 2006, Plater filed a civil complaint alleging employment discrimination and retaliation in the United States District Court for the District of Columbia.

209.    After receiving correspondence from Plater's counsel and learning that Plater had filed a discrimination charge with the EEOC, and learning that Plater had filed a civil complaint in the United States District Court for the District of Columbia, Defendant has subjected Plater to continuing retaliatory treatment, including harassment, hostile work environment, deprivation of splicer training, deprivation of splicing opportunities, exposure to danger in connection with Plater's first lead cable splice, denial of Cable Splicer pay, and denial of opportunities to fulfill the qualifications for Cable Splicer certification.  Defendant's conduct constitutes retaliation in violation of the DCHRA.

210.    Defendant's retaliatory actions were intentional and based on race.  Defendant acted with malice or reckless indifference to Plater's rights.

211.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's retaliatory actions.

212.    Plater has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from Defendant's retaliatory job treatment.

213.    Plater has suffered lost wages and benefits resulting from the retaliatory job treatment.

214.    Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's retaliatory policies and practices.

## COUNT TEN

**(Section 1981 -- Denial of Equal Pay -- Plater)**

1203358.12

215.   Plater incorporates allegations 1 through 211 above as though fully set forth herein.

216.   Plater is African-American and a member of a protected class.

217.   Defendant failed to compensate Plater at the rate at which similarly situated white employees were paid for similar work and at the rate to which he was entitled under the contractual arrangements that governed Plater's pay.

218.   Defendant's failure to compensate Plater appropriately was intentional and based on race.  Defendant acted with malice or with reckless indifference to Plater's rights.

219.   Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

220.   Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

221.   Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

222.   Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT ELEVEN

### (Title VII -- Denial of Equal Pay -- Plater)

223.   Plater incorporates allegations 1 through 219 above as though fully set forth herein.

224.   Plater is African-American and a member of a protected class.

1203358.12

225.    Defendant failed to compensate Plater at the rate at which similarly situated white employees were paid for similar work and at the rate to which he was entitled under the contractual arrangements that governed Plater's pay.

226.    Defendant's failure to compensate Plater appropriately was intentional and based on race. Defendant acted with malice or with reckless indifference to Plater's rights.

227.    Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

228.    Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

229.    Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

230.    Plater has no plain, adequate, or complete remedy at law. He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT TWELVE

### (DCHRA -- Denial of Equal Pay -- Plater)

231.    Plater incorporates allegations 1 through 227 above as though fully set forth herein.

232.    Plater is African-American and a member of a protected class.

233.    Defendant failed to compensate Plater at the rate at which similarly situated white employees were paid for similar work and at the rate to which he was entitled under the contractual arrangements that governed Plater's pay.

1203358.12

234.   Defendant's failure to compensate Plater appropriately was intentional and based on race.  Defendant acted with malice or with reckless indifference to Plater's rights.

235.   Defendant's actions and reckless indifference have deprived Plater of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

236.   Plater has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

237.   Plater has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

238.   Plater has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT THIRTEEN

### (Section 1981 -- Hostile Work Environment -- McCoy)

239.   McCoy incorporates allegations 1 through 235 above as though fully set forth herein.

240.   McCoy is African-American and a member of a protected class.

241.   Defendant violated McCoy's civil rights under Section 1981 by creating, encouraging, condoning and/or tolerating a racially hostile work environment, which McCoy has experienced from the beginning of his employment up to his termination.  The discriminatory practices described above, including but not limited to, subjecting McCoy to unreasonably harsh and disproportionate criticism and discipline; failing to provide McCoy with the tools and information necessary to complete his work -- tools and information provided to white

- 44 -

1203358.12

employees; subjecting him to excessive scrutiny and to unreasonably harsh and disproportionate criticism and discipline based on trivial or non-existent violations of procedures; depriving him of the splicer's pay to which he was entitled and forcing McCoy to perform inappropriately lower-level tasks, thereby degrading and stigmatizing him in the eyes of his peers; all combined to create a racially hostile environment.

242.    Defendant knew or should have known that its employees were engaging in discriminatory practices directed at McCoy and other minorities and subjecting McCoy to unwelcome racially offensive and demeaning treatment while working within the scope and in furtherance of their employment.  Indeed, current Vice-President of Human Resources Orange was a lead perpetrator in the creation of the racially hostile environment at Chester and supervisory foremen both perpetrated and condoned much of the hostile conduct.

243.    The discriminatory conduct and racial hostility toward McCoy and other African-Americans was sufficiently severe and pervasive to alter the terms and conditions of McCoy's employment.  Defendant was aware that McCoy did not find the hostile conduct welcome.

244.    Defendant's discrimination against McCoy was intentional and based on race. Defendant acted with malice or with reckless indifference to McCoy's rights.

245.    Defendant's actions and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

246.    McCoy has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions, including severe emotional pain and distress, mental anguish, humiliation and embarrassment.

1203358.12

247.    McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's racially discriminatory policies and practices.

### COUNT FOURTEEN

### (DCHRA -- Hostile Work Environment -- McCoy)

248.    McCoy incorporates allegations 1 through 244 above as though fully set forth herein.

249.    McCoy is African-American and a member of a protected class.

250.    Defendant violated McCoy's civil rights under DCHRA by creating, encouraging, condoning and/or tolerating a racially hostile work environment, which McCoy has experienced from the beginning of his employment up to his termination.  The discriminatory practices described above, including but not limited to, subjecting McCoy to unreasonably harsh and disproportionate criticism and discipline; failing to provide McCoy with the tools and information necessary to complete his work -- tools and information provided to white employees; subjecting him to excessive scrutiny and to unreasonably harsh and disproportionate criticism and discipline based on trivial or non-existent violations of procedures; depriving him of the splicer's pay to which he was entitled and forcing McCoy to perform inappropriately lower-level tasks, thereby degrading and stigmatizing him in the eyes of his peers; all combined to create a racially hostile environment.

251.    Defendant knew or should have known that its employees were engaging in discriminatory practices directed at McCoy and other minorities and subjecting McCoy to unwelcome racially offensive and demeaning treatment while working within the scope and in furtherance of their employment.  Indeed, current Vice-President of Human Resources Orange

1203358.12

was a lead perpetrator in the creation of the racially hostile environment at Chester and supervisory foremen both perpetrated and condoned much of the hostile conduct.

252.    The discriminatory conduct and racial hostility toward McCoy and other African-Americans was sufficiently severe and pervasive to alter the terms and conditions of McCoy's employment.  Defendant was aware that McCoy did not find the hostile conduct welcome.

253.    Defendant's discrimination against McCoy was intentional and based on race. Defendant acted with malice or with reckless indifference to McCoy's rights.

254.    Defendant's actions and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

255.    McCoy has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions, including severe emotional pain and distress, mental anguish, humiliation and embarrassment.

256.    McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's racially discriminatory policies and practices.

## COUNT FIFTEEN

### (Section 1981 -- Denial of Equal Pay -- McCoy)

257.    McCoy incorporates allegations 1 through 253 above as though fully set forth herein.

258.    McCoy is African-American and a member of a protected class.

1203358.12

259.   Defendant failed to compensate McCoy at the rate at which some similarly situated white employees were paid for similar status and work and at the rate to which he was entitled under the contractual arrangements that governed McCoy's pay.

260.   Defendant's failure to compensate McCoy appropriately was intentional and based on race.  Defendant acted with malice or with reckless indifference to McCoy's rights.

261.   Defendant's actions and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

262.   McCoy has suffered, and is continuing to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

263.   McCoy has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

264.   McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT SIXTEEN

### (DCHRA -- Denial of Equal Pay -- McCoy)

265.   McCoy incorporates allegations 1 through 261 above as though fully set forth herein.

266.   McCoy is African-American and a member of a protected class.

267.   Defendant failed to compensate McCoy at the rate at which similarly situated white employees were paid for similar work and at the rate to which he was entitled under the contractual arrangements that governed McCoy's pay.

- 48 -

1203358.12

268.   Defendant's failure to compensate McCoy appropriately was intentional and based on race.  Defendant acted with malice or with reckless indifference to McCoy's rights.

269.   Defendant's actions and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

270.   McCoy has suffered, and is continuing to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

271.   McCoy has suffered lost wages and benefits resulting from Defendant's discriminatory job treatment.

272.   McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory policies and practices.

## COUNT SEVENTEEN

### (Section 1981 -- Discriminatory Termination -- McCoy)

273.   McCoy incorporates allegations 1 through 269 above as though fully set forth herein.

274.   McCoy is African-American and a member of a protected class.

275.   McCoy is an experienced Cable Splicer and fully qualified for the Cable Splicer position at Chester.

276.   McCoy was discharged without cause.

277.   McCoy's discharge was based on pretextual grounds and was the result of Defendant's pattern and practice of racial discrimination as applied to McCoy.

- 49 -

1203358.12

278.    Defendant's discrimination against McCoy was intentional and based on race. Defendant acted with malice or with reckless indifference to McCoy's rights.

279.    Defendant's action and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

280.    McCoy has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

281.    McCoy has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from Defendant's discriminatory action.

282.    McCoy has suffered lost wages, benefits and commissions resulting from discriminatory termination.

283.    McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory termination.

## COUNT EIGHTEEN

### (DCHRA -- Discriminatory Termination -- McCoy)

284.    McCoy incorporates allegations 1 through 280 above as though fully set forth herein.

285.    McCoy is African-American and a member of a protected class.

286.    McCoy is an experienced Cable Splicer and qualified for the Cable Splicer position at Chester.

287.    McCoy was discharged without cause.

288.    McCoy's discharge was based on pretextual grounds and was the result of Defendant's pattern and practice of racial discrimination as applied to McCoy.

1203358.12

289.  Defendant's discrimination against McCoy was intentional and based on race. Defendant acted with malice or with reckless indifference to McCoy's rights.

290.  Defendant's action and reckless indifference have deprived McCoy of the enjoyment of the benefits, privileges, terms and conditions of his contractual relationship with Defendant.

291.  McCoy has suffered, and will continue to suffer, severe and substantial damages as a direct and proximate result of Defendant's discriminatory actions.

292.  McCoy has suffered severe emotional pain and distress, mental anguish, humiliation and embarrassment resulting from Defendant's discriminatory action.

293.  McCoy has suffered lost wages, benefits and commissions resulting from discriminatory termination.

294.  McCoy has no plain, adequate, or complete remedy at law.  He has suffered, and is continuing to suffer, irreparable injury because of Defendant's discriminatory termination.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs Plater and McCoy respectfully request that the Court enter a judgment:

A.  declaring that the acts and practices complained of herein are in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended, Title VII of the Civil Rights Act of 1964, as amended, and the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401, et seq.;

B.  enjoining and permanently restraining Defendant from violating Section 1981, Title VII and the DCHRA;

1203358.12

C.      directing Defendant to make Plaintiffs whole for all earnings and other job benefits they would have received but for Defendant's discriminatory treatment, including, but not limited to, wages, pension, and other lost benefits plus pre-judgment and post-judgment interest;

D.      directing Defendant to reinstate Plaintiff McCoy;

E.      directing Defendant to pay Plaintiffs front pay;

F.      awarding Plaintiffs compensatory damages;

G.      awarding Plaintiffs punitive damages in an amount appropriate to the proof at trial;

H.      directing Defendant to pay Plaintiffs' costs, reasonable attorneys' fees and expenses associated with this action; and

I.      granting such other and further relief as this Court deems necessary and proper.

1203358.12

## <u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury on all claims so triable as of right.

Respectfully submitted,

Susan E. Huhta, 453478
Warren K. Kaplan, 034470

WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS &
URBAN AFFAIRS
11 Dupont Circle NW
Suite 400
Washington, DC 20036
(202) 319-1000

Joseph G. Davis, 441479
Jocelyn C. Flynn, 458632
Renee L. Thorne, 485697

WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
(202) 303-1000